UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION - FLINT

IN RE:

      BETTY LOU FOX,                          Case No. 09-34314-dof
                                            Chapter 7 Proceeding
          Debtor.                        Hon. Daniel S. Opperman
_____/

JOHN BARCUME,

      Plaintiff,

v.                                           Adversary Proceeding
                                            Case No. 09-3514-dof

BETTY LOU FOX,

      Defendant.
_____/

OPINION ON COMPLAINT TO DENY DEBTOR'S DISCHARGE
UNDER 11 U.S.C. §§ 727(A)(2) AND (A)(4)

Plaintiff John Barcume filed this adversary proceeding objecting to Debtor's discharge under 11 U.S.C. §§ 727(a)(2)(A) and (a)(4)(A).[1] Defendant-debtor, Betty Lou Fox, filed her answer to the Plaintiff's Complaint requesting that she be granted a discharge. The Court conducted the Trial of this matter on November 16, 2010, allowed for the filing of briefs in lieu of closing arguments, and took this matter under advisement. After reviewing all the pleadings and evidence, considering the testimony of all the witnesses and arguments of counsel, the Court holds that Plaintiff has not met his burden with respect to either Section 727(a)(2) or Section 727(a)(4) and, therefore, will not sustain Plaintiff's objection to Defendant's discharge.

_____

[1] Defendant subsequently filed a counter-complaint in this action, but Defendant's claims in the counter-claim are now the subject of a separate adversary proceeding. This Opinion only addresses Plaintiff's Complaint.

1

<u>Findings of Fact</u>

Defendant voluntarily filed her Chapter 7 petition on August 13, 2009. Plaintiff commenced this adversary proceeding by filing a two-count Complaint on November 20, 2009. Defendant answered the Complaint on December 1, 2009. Plaintiff amended his Complaint on February 24, 2010, and added another alleged transfer done with the intent to hinder, delay, or defraud. On March 3, 2010, Defendant responded by denying the material allegations.

The following uncontested facts are adopted as set forth in the Joint Final Pre-Trial Order. Plaintiff obtained a series of state court judgments totaling $131,453.51 against Defendant in April, 2009. Shortly thereafter, on May 12, 2009, Defendant sold her entire membership interest in Foxwood Furniture, LLC ("Foxwood")[2] to Robert Altenberg for $5,000. The next day, May 13, 2009, a writ of execution was entered against Defendant.

On May 15, 2009, Defendant granted Navinchandra J. Shah a lien on a 2000 Dodge van she owned. Defendant's Schedule D failed to disclose this lien. Defendant, on May 27, 2009, transferred to Shah her interest in a 2008 Toyota Yaris. However, Defendant still used and possessed the Yaris following the transfer. Defendant also transferred a 2000 Jeep to her daughter for no consideration on June 9, 2009. Also by June of 2009, Plaintiff executed on a 1997 Lexus owned by Defendant in partial satisfaction of the state court judgment.

Prior to and following the sale of Foxwood to Altenberg, Defendant used Foxwood's bank accounts to pay her personal creditors and expenses. These payments were treated as loans

---

[2] The Joint Final Pre-Trial Order identifies this entity as "Foxwood Furniture Restoration, LLC." At Trial, Defendant testified she was the sole member of Foxwood Furniture, LLC (the entity she sold to Mr. Altenberg) and that she also owned Foxwood Restoration. Defendant also referred to the company that was sold, and purchased by Mr. Altenberg, as "Foxwood Restoration."

as evidenced by Foxwood's general ledger reflecting loans made from Foxwood to Defendant to pay personal expenses. Defendant, after the state court lawsuit commenced, also used the bank accounts of B. Fox Rental, LLC ("Fox Rental") to pay personal creditors and expenses. Lastly, Defendant also failed to disclose on Schedule B her interest in a 1999 Chevrolet.

Additional findings of fact from the Trial will be referenced, for sake of brevity, in later sections of this Opinion.

Jurisdiction

This Court has subject matter jurisdiction over this proceeding under 28 U.S.C. §§ 1334(b), 157(a), and 157(b)(1) and E. D. Mich. LR 83.50(a). This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(J).

Applicable Law

Section 727(a) of the Bankruptcy Code provides that a debtor is entitled to a discharge unless one or more of twelve exceptions is met. Although exceptions to discharge are strictly construed against a creditor, *Rembert v. AT&T Universal Card Services, Inc. (In re Rembert),*141 F.3d 277, 281 (6th Cir. 1998), "a discharge in bankruptcy is a privilege, not a right, and should only inure to the benefit of the honest debtor." *Wazeter v. Michigan National Bank (In re Wazeter)*, 209 B.R. 222, 227 (W.D. Mich. 1997). Pursuant to Fed. R. Bankr. P. 4005, the burden of proof in objecting to a discharge under Section 727 is on the plaintiff and must be established by a preponderance of the evidence. *Keeney v. Smith* (*In re Keeney*), 227 F.3d 679, 683 (6th Cir. 2000); *Barclays/American Bus. Credit, Inc., v. Adams (In re Adams)*, 31 F.3d 389, 394 (6th Cir. 1994).

<u>Analysis</u>

Sections 727(a)(2) and (4) require scienter. The Court will focus first upon Section 727(a)(2)(A) and then Section 727(a)(4)(A).

A.    *11 U.S.C. § 727(a)(2)(A)*

Section 727(a)(2) states, in relevant part:

(a) The court shall grant the debtor a discharge, unless – . . .

>    (2) the debtor, with intent to hinder, delay, or defraud a creditor . . .
>    has transferred, removed, destroyed, mutilated, or concealed, or
>    has permitted to be transferred, removed, destroyed, mutilated, or
>    concealed –
>
>    >    (A) property of the debtor, within one year before
>    >    the date of the filing of the petition[.]

In order to deny a debtor his discharge, Section 727(a)(2) requires that four elements be proven: (1) transfer or concealment of debtor's property; (2) by the debtor; (3) within one year of filing the bankruptcy petition; and (4) with the debtor's actual intent to hinder, delay, or defraud creditors or an officer of the estate. *See Nate B. and Francis Spingold Foundation, Inc. v. Halperin (In re Halperin)*, 215 B.R. 321, 328 (Bankr. E.D.N.Y. 1997).

Because a debtor rarely admits to acting "with actual intent to hinder, delay, or defraud creditors or an officer of the estate," courts have considered so-called "badges of fraud"as indicators of intent to defraud:

(1)    the transfer was to an insider;
(2)    the debtor retained possession or control of the property transferred after the transfer;
(3)    the transfer was disclosed or concealed;
(4)    before the transfer was made, the debtor had been sued or threatened with suit;
(5)    the transfer was of substantially all of the debtor's assets;
(6)    the debtor absconded;

4

(7)     the debtor removed or concealed assets;

(8)     the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred;

(9)     the debtor was insolvent or became insolvent shortly after the transfer was made;

(10)    the transfer occurred shortly before or shortly after a substantial debt was incurred; and

(11)    the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

*Taunt v. Wojtala (In re Wojtala)*, 113 B.R. 332, 336 (Bankr. E.D. Mich. 1990) (citations omitted). These "badges of fraud" have also been articulated as:

1. The lack or inadequacy of consideration;
2. A family, friendship, or other close associate relationship between the parties;
3. The retention of possession, benefit, or use of the property in question;
4. The financial condition of the party sought to be charged both before and after the transaction in question;
5. The existence or cumulative effect of a pattern or series of transactions or course of conduct after incurring of debt, onset of financial difficulties, or pendency or threat of suit by creditors; and
6. The general chronology of events and transaction.

*Stevenson v. Cutler (In re Cutler)*, 291 B.R. 718, 723 (Bankr. E.D. Mich. 2003) (citation omitted).

With respect to whether a debtor's transfer was intended to hinder or delay creditors, courts consider other factors including:

(1) whether the transaction is conducted at arms-length; (2) whether the debtor is aware of the existence of a significant judgment or over-due debt; (3) whether a creditor is in hot pursuit of its judgment/claim and whether debtor knows this; and (4) the timing of the transfer relative to the filing of the petition. Thus while a court may, after viewing all of the relevant factors, determine that the debtor did not intend to defraud any creditor it may still reach the conclusion that the debtor did intend to hinder or delay a creditor.

*In re Wojtala*, 113 B.R. at 336-37; *see also Warchol v. Barry (In re Barry)*, 431 B.R. 533, 540, 540 n.11 (Bankr. D. Mass. 2010) (citing *In re Wojtala*'s factors and noting that the "badges of

5

fraud" more frequently used by courts "are more relevant to an inquiry as to whether a debtor intended to defraud a creditor under § 727 rather than hinder or delay a creditor under the same section").

The Court applies these principles to the five transactions identified by Plaintiff: (1) the transfer of Foxwood to Altenberg for less than equivalent value; (2) the concealment of income through depositing her income into Foxwood's and Fox Rental's accounts and paying expenses from those accounts; (3) the transfer of lien on the 2000 Dodge Ram to Shah; (4) the transfer of the 2008 Toyota Yaris to Shah; and (5) the transfer of the 2000 Jeep to Defendant's daughter for no consideration.

Defendant does not contest that in each transaction Plaintiff's evidence establishes that she either transferred or concealed her property within one year of the petition. The Court therefore finds that elements one, two, and three of Section 727(a)(2)(A) are met. *In re Halperin*, 215 B.R. at 328. Thus, the only element in dispute in each instance is whether Defendant intended to hinder, delay, or defraud.

**1.    Transfer of Foxwood to Altenberg**

In his post-trial brief, Plaintiff argues the stipulated facts and the testimony at Trial evidence several "badges of fraud." Plaintiff specifically relies on the "badges" of inadequate consideration, Defendant's purportedly close relationship with Altenberg, and Defendant's retention of the benefit of and use of Foxwood, citing *In re Cutler*, 291 B.R. at 723.

Regarding the adequacy of consideration, Defendant sold all her interest in Foxwood to Altenberg for $5,000, just 19 days after Plaintiff obtained a state court judgment against her. Plaintiff, who is an accountant of 30 years and owned multiple business himself, testified that he

believed that Foxwood's value was much higher. During direct examination, Plaintiff detailed how he analyzed Foxwood's tax returns for the years 2006, 2007, and the partial filing in 2008 and used self-created "guidelines" to arrive at an estimated value of $80,000 - $125,000. Plaintiff sent a pre-petition letter to Defendant's counsel on behalf of several investors offering buy Foxwood for $120,000, payable in monthly installments of $1,000 over a ten year period. Plaintiff also testified that Defendant testified at her deposition that she believed the business was worth more than the $5,000.

Plaintiff further testified he estimated Defendant's annualized salary for 2009 at approximately $50,000. He calculated this by examining Foxwood's 2009 financial statements, which showed that Defendant received a yearly salary of $15,600 in addition to having approximately $35,000 - $36,000 in personal expenses paid by Foxwood. Plaintiff testified he had never seen a business sell for $5,000 where the owner was drawing approximately $50,000 in annual salary. However, on cross examination, Plaintiff testified that he offered $9,000 to the chapter 7 trustee to purchase Foxwood. On redirect, Plaintiff explained that $9,000 was the value provided to him by the trustee and that he told the trustee he thought he could sell it for $50,000.

Defendant explained at Trial that she sold Foxwood because sales were "tanking" and customers were not paying and she had "absolutely no alternative" but to sell. Defendant further testified that a condition of the sale of Foxwood's assets and liabilities to Altenberg required her to continue to perform the restoration services for a period of time after the sale. Defendant testified that she knew Altenberg because his business was located next to Foxwood.

Altenberg testified that he met Defendant in 2005 when their respective business were

7

located in the same building.  Altenberg testified he purchased Defendant's ownership interest and the assets of Foxwood after Defendant spoke to him about declining sales and that "business was slipping."   He also testified he determined the purchase price by walking through the shop, and deciding a "fair appraisal" of the value of Foxwood's equipment was $2,500, and negotiating with Defendant, who wanted $10,000, for the $5,000 purchase price.  Altenberg corroborated Defendant's testimony that a condition of the purchase was that Defendant continue to run Foxwood.

With respect to the retention of the benefit of and use of Foxwood, Plaintiff points to an instance where Defendant allegedly held herself out as the sole proprietor in the state court suit and her history of paying personal expenses from Foxwood's account.  When asked on cross examination about the state court lawsuit, which Defendant filed post-petition as the sole proprietor of "Foxwood Furniture Restoration," Defendant testified that the name was not an assumed name of either Foxwood or herself, but was Foxwood's "advertising name."  Defendant then testified that she initiated the lawsuit to recover an account receivable she believed arose post sale because that was when the work was completed.  However, Defendant also testified that she did the work for Foxwood.  She also acknowledged that since all receivables were sold to Altenberg, "technically" the receivable sought in the lawsuit belonged to Foxwood.  On redirect, however, Defendant testified that she did not discuss with Altenberg the sale of any receivables.

Regarding the payment of personal expenses from Foxwood's account, during cross examination Plaintiff testified that from his preparation of Foxwood's tax returns he was aware that Defendant had previously transferred funds out of Foxwood's account to pay personal

8

expenses. Defendant confirmed that before the sale she had paid personal expenses out of Foxwood's account, and that continued after the sale to Altenberg with his knowledge. Defendant testified that she also had a personal account as well as an account for depositing checks from the tenants of her multiple rental units. Defendant further testified that due to her "booking being so scattered," she frequently transferred money between the various accounts to pay whatever bills needed to be paid at the time. Altenberg testified that he knew Defendant paid personal bills out of Foxwood's account before he purchased the business, and after the purchase he permitted the payments to continue, but considered those payments loans that at the time of Trial had been fully paid back via wage reductions.

The Court finds that while the circumstances surrounding the sale may be irregular, they do not rise to the level of an intent to hinder, delay, or defraud. Addressing first the alleged inadequate consideration for the sale of Foxwood, the Court finds that Plaintiff's valuation does not provide a basis to deny Defendant's discharge. Plaintiff did not offer into evidence any independent valuation of Foxwood and admitted his valuation method was not an "exact science." Plaintiff testified his "guidelines" valued a business by utilizing either a business's profit multiplied by a factor of five (e.g., profit of $20,000 per year then value is $100,000) or using total yearly sales as the selling price. Plaintiff would then use these results, along with the history of the business, and shop the business around to "come up with a number." However, neither of Plaintiff's self-created "guidelines" considered Foxwood's slumping sales or the general economic climate at the time of the sale, especially given the non-essential nature of Defendant's business. Plaintiff's value of $80,000 - $125,000 simply failed to account for those factors. In addition, Altenberg testified without contradiction that Foxwood's assets were only

9

worth about $2,500. Further undermining Plaintiff's valuation is the Trustee's offer to sell Foxwood to Plaintiff for $9,000, notwithstanding Plaintiff's testimony that he believed he could still sell Foxwood for $50,000.

The Court notes that Defendant testified at her deposition how the economic decline in 2008 and 2009 affected her in numerous ways. The failure of her tenants to pay rent caused her to have insufficient funds to pay her mortgages. Defendant also explained in great detail at her deposition that the poor economy and all her obligations put significant stress and pressure on her to the point that she decided to sell Foxwood to Altenberg. All these factors clearly influenced the price Defendant was willing to accept to be free from the mounting stress.

Furthermore, the Court does not find that Defendant's relationship with Altenberg was the type of close relationship that would support inferring a subjective intent to hinder, delay, or defraud. Altenberg and Defendant owned businesses located near one another. The close proximity led to some degree of familiarity with one another, as the two often discussed the economy and other topics. This proximity also led to a business relationship in which Defendant hired Altenberg to complete small projects for Foxwood. Thus, while the sale did come shortly after Plaintiff obtained a substantial judgment against Defendant and may have been less than might have been obtained if the economy were more robust, the overall external circumstances surrounding the sale of Foxwood do not support the inference that Defendant intended to hinder, delay, or defraud creditors.

Turning next to the alleged retention of the benefit and use of Foxwood, the only real retention of benefit focused on at trial by Plaintiff was Defendant's post-petition filing of a state court lawsuit in Foxwood's advertising name to recover an account receivable. Defendant's

10

testimony gave the impression that simply because the project on which she was suing was not completed until after the sale of Foxwood that somehow the receivable was not sold to Altenberg. Defendant did admit, however, on cross examination that the work was done for Foxwood and that she sold all assets to Altenberg. When pressed, Defendant also acknowledged that "technically" the receivable did belong to Foxwood. Considering all the testimony, the Court infers that Defendant did know that the receivable was not owned by her at the time she initiated the lawsuit. Additionally, the Court notes that the lawsuit at issue sought only $300. In contrast to the amount of Plaintiff's total judgment, that amount is insignificant. Thus, while Defendant may have known that she did not own the receivable at issue, the circumstances do not support an inference of an intent to hinder, delay, or defraud creditors by suing for a minimal account receivable using the advertising name of Foxwood.

Lastly, Defendant's use of Foxwood's account post-sale to pay personal expenses was simply a continuance of her prior conduct. Defendant testified at trial that her bookkeeping skills were not the best and she frequently transferred money between several business and personal accounts in order to meet current personal and business obligations. Plaintiff testified he knew of Defendant's tendency to do this from his preparation of Foxwood's taxes. Altenberg testified that he was aware of Defendant's use of Foxwood's account and permitted it for a time post-sale. Altenberg considered the personal payments to be loans from Foxwood to Defendant, which loans Defendant paid back in full. Similar to the other alleged "badges of fraud," these circumstances do not support an inference that Defendant intended to hinder, delay, or defraud creditors through the use of Foxwood's account to pay personal expenses.

11

## 2.      Concealment of Income

Plaintiff argues Defendant closed a personal bank account on May 7, 2009, just 14 days after the first state court judgment was entered.  Two months earlier that account had a balance of $9,464.  Plaintiff argues Defendant deposited personal funds into Foxwood's account and used that account to pay personal expenses both before and after the sale.  Plaintiff contends these acts concealed Defendant's property.  Rather than relying on "badges of fraud" as circumstantial evidence of an intent to hinder, delay, or defraud, Plaintiff relies solely on cases holding that depositing ones funds into another's bank account is concealment of property warranting the denial of discharge.  Specifically, Plaintiff cites the cases of *Roude v. Sharp (In re Sharp)*, 244 B.R. 849 (Bankr. E.D. Mich. 2000), and *U.S. v. Craig (In re Craig)*, 252 B.R. 822 (Bankr. S.D. Fl. 2000).

Defendant does not dispute that she closed the account in question; in fact, Defendant disclosed this account in her Statement of Financial Affairs.  Defendant also does not dispute that prior to the sale of Foxwood she deposited personal income into Foxwood's account and used the account to pay personal expenses.  Altenberg also testified that he knew Plaintiff used Foxwood's account in this manner and considered the funds loans, which Defendant paid back in their entirety.  Moreover, Plaintiff testified on cross examination that he was aware as early as 2006 that Plaintiff used Foxwood's account to pay her personal bills.  As discussed earlier, Defendant's bookkeeping was such that she when she received income from various sources, Foxwood or rental income, she would deposit or transfer that income into whichever account at that time needed funds to cover bills.

While the cases cited by Plaintiff certainly hold that concealing funds by placing those

12

funds into another's account is sufficient to deny a debtor his or her discharge, the extreme facts of those cases easily distinguish them from the circumstances before the Court in this case. For example, in *In re Craig*, the court set forth in significant detail the debtor's multiple and egregious contradictions related to her actions in signing checks drawn on her son's account and writing checks for a corporation that she denied knowledge of, but for which she was the sole officer of record. *In re Craig*, 252 B.R. at 826. Moreover, that debtor conceded she tried to hinder creditors for years by placing her funds into her son's account, and she admitted this was done partly in response to the IRS and another creditor seizing bank accounts in her name. *Id*. at 827-28. Thus, the debtor in *In re Craig* had an admitted pattern of concealing money for the purpose of evading or hindering creditors.

Somewhat similarly, the concealment noted by the court in *In re Sharp* was just one of many transgressions for which the debtor's discharge was denied. There, the debtor failed to disclose that he put almost $1,200 of his funds into an account held by his father. *In re Sharp*, 244 B.R. at 893. But this concealment and failure to disclose was just one of many other failures to disclose, such as the failure to disclose a cash transfer to girlfriend, undisclosed debts to credit card companies, and a debt of $6,500 owed to the debtor by his ex-spouse. *Id*. In addition, the crux of the court's decision in *In re Sharp* dealt with the debtor's utter lack of credibility, his "evasive and rambling" testimony that "was inconsistent and at times even incoherent[,]" an "extensive pattern of deceit," and the simple fact that the debtor failed to testify truthfully. *Id*. at 893-94. In particular, the court found that the debtor's explanation of why he used an account in his father's name to be "inconsistent, more than a bit silly in some cases, and in the end just plain dishonest." *Id*. at 895.

13

The circumstances here lack the evasive pattern of significant deceit and admitted hindering of creditors. As noted, Defendant fully disclosed the closing of the account in question in her Statement of Financial Affairs. While Plaintiff argues the account in question had almost $10,000 in it approximately two months before Defendant closed the account, Plaintiff's Exhibit 3 shows the account contained only approximately $1,000 seven days after the first state court judgment was entered. The Court's independent review of Defendant's bank records for the relevant time reveals only two transactions dealing with Foxwood – one transferring money *from* Foxwood to Defendant's account and one transferring the exact same amount back to Foxwood. Contrary to Plaintiff's assertions, the evidence shows that any dissipation of funds went towards paying various personal and business creditors between March and May of 2009, rather than directly into Foxwood's account. In the context of Section 727(a)(2)(A), "[t]he question is not whether creditors are in fact delayed or hindered, (they always are) but rather whether the debtor intended to delay or hinder the creditor." *In re Wojtala*, 113 B.R. at 338. Considering Plaintiff testified that, as a result of his tax preparation for Foxwood, he knew that Defendant historically used Foxwood's account to pay personal bills, it is hard to fathom how Defendant could conceal actions that Plaintiff was fully aware occurred. Plaintiff has not met his burden to show intent to delay or hinder from the Court's perspective.

The Court further notes that Defendant testified at her deposition that Foxwood's account provided certain benefits, such as online banking, that her personal account did not. It is understandable, then, that Defendant found it more convenient to pay expenses from that account. Defendant also testified at her deposition that she put rental checks into Foxwood's account, checks admittedly payable to her personally, because she "had other Foxwood bills to

14

pay." This evidences that Defendant's financial situation was so precarious that she generally paid whatever bill need to be paid – whether business or personal – from whatever funds or account necessary at the time. Considering all the circumstances, the Court finds that Defendant did not have the intent to delay or hinder creditors when she used Foxwood's account in this manner. Unlike the debtors in *In re Sharp* or *In re Craig*, Defendant did not deny or fail to disclose the placing of funds into Foxwood's account. Rather, it is clear Defendant's unorthodox bookkeeping and the benefits offered by Foxwood's account simply made its use more convenient. Therefore, the Court will not deny Defendant's discharge on this basis.

### 3. Transfers of the Yaris title and lien on Dodge

The parties do not dispute that Defendant granted Shah a lien on her 2000 Dodge van and transferred title of the 2008 Toyota Yaris on May 15 and 27, 2009, respectively. Thus, the only issue again is Defendant's intent at the time of these transfers. Plaintiff relies on the "badges of fraud" of the close relationship between Defendant and Shah, the adequacy of the consideration, and the retention and use of the Yaris following the transfer.

Both Defendant and Shah testified that Shah loaned Defendant approximately $6,800 in July of 2008 to assist her purchase of the Yaris. Defendant and Shah also both testified Shah placed a lien on the Yaris on the date of purchase, and Plaintiff acknowledged the existence of this lien during cross-examination. This lien is also evidenced by the Michigan certificate of title issued on August 28, 2008, showing Shah as a secured party. Defendant also testified she transferred title to the Yaris to Shah after he expressed concern about Defendant's ability to repay his loan. Shah testified that he was concerned about Defendant's ability to repay him, and in his view Defendant did not need the Yaris due to her business "going downhill." Both

15

Defendant and Shah testified that Shah gave Defendant a credit of approximately $5,700 towards the amount she owed. Shah testified he determined this credit by considering the mileage and the condition of the car.

Defendant's Statement of Financial Affairs indicates she resided at Shah's residence at the time she filed her petition, and Defendant did not contradict Plaintiff's testimony that she was living with Shah at the time. Plaintiff testified that at Defendant's deposition she testified that the Yaris was her "only vehicle," that she drove it "everyday to work," and that she did not pay Shah any rent for the use of the Yaris. Contradicting this testimony, Shah testified that after the transfer of title he permitted Defendant to drive the Yaris "occasionally," "maybe once a month . . . [or] twice a month" when Defendant requested to use the vehicle. Defendant was not asked at trial about how often she used the Yaris after she transferred title to Shah.

With respect to the lien on the Dodge van, Plaintiff testified Defendant gave Shah the lien just two days after the seizure of the Lexus. Defendant testified she granted Shah a lien on the Dodge van as additional security for the $1,099.40 balance remaining on his loan after she transferred title of the Yaris to him. Shah also testified that he asked Defendant for a lien on the Dodge van because outstanding balance owed on the Yaris loan. Shah later clarified that he and Defendant "mutually agreed" that Defendant would grant a lien. Shah further testified that the van was "pretty beat" up, and he did not examine the odometer.

The Court finds that Plaintiff has not met his burden to show an intent on Defendant's part to hinder, delay or defraud creditors through these transfers. Plaintiff acknowledged he was aware of a pre-existing lien on the Yaris, which secured a loan made to Defendant by Shah. Plaintiff offered no evidence of the value of the Yaris as of the date of the transfer, so there is no

16

evidence there was any equity above the undisputed lien held by Shah. Plaintiff did not introduce evidence to contradict Defendant's and Shah's testimony that the transfer of the title to the Yaris occurred, in essence, because Shah called in the loan out of concern about Defendant's ability to repay the loan after observing that Defendant's business was suffering. Moreover, it was uncontradicted by Plaintiff that following the transfer of the title to the Yaris, Defendant still owed Shah over $1,000 and that is why she granted him a lien on the Dodge van. "'[T]he mere preferential payment of a valid debt is not a statutory ground for the denial of discharge . . . rather 'the preferential transfer must have been made with the specific intent to hinder, delay, or defraud creditors beyond that implied by a preference.'" *In re Barry*, 431 B.R. at 539 (quoting *Everwed Co. v. Ayers (In re Ayers)*, 25 B.R. 762, 770 (Bankr. M.D. Tenn. 1982)); *Jahn v. Flemings (In re Flemings)*, 433 B.R. 230, 237 (Bankr. E.D. Tenn. 2010) (citation omitted) (debtor used cash proceeds from sale of property to "prefer[ ] one creditor over another" but "a preference alone does not usually give rise to a denial of discharge"). Here the evidence demonstrates that while Defendant may have preferred Shah to Plaintiff in her transfer of title, she did not do so with the intent to hinder, delay, or defraud Plaintiff. Defendant's business was declining and Shah, being able to observe the financial struggles more quickly than other creditors, essentially called in the loan and Defendant obliged by transferring title to the vehicle in which Shah already had a security interest.

The Court is also not persuaded that the relationship between Defendant and Shah existing at the time of the granting of either lien, is a "badge of fraud" to infer an intent to hinder, delay, or defraud. Defendant introduced the ledger kept by Shah evidencing the loan and the subsequent credit granted Defendant in consideration of the transfer of title. This ledger

17

demonstrates the business nature of the transaction because, even if there was a close relationship, Shah kept a written record of the loan. Again, preferring one creditor over another does not necessarily mean Section 727(a)(2) has been satisfied. *In re Barry*, 431 B.R. at 539. In addition, "[e]vidence of some other convincing explanation other than an intent to hinder, delay or defraud may supercede the implications initially presented by the presence of certain badges of fraud." *Adamson v. Bernier (In re Bernier)*, 282 B.R. 773, 782 (Bankr. D. Del. 2002) (citation omitted). Defendant convincingly explained that, whatever the nature of her relationship with Shah, the circumstances surrounding the transfers at issue were business related.

With respect to the use of the Yaris following the transfer of title, the testimony is somewhat conflicting, but is not sufficient to allow the Court to infer an intent to hinder, delay, or defraud. Defendant was not questioned at Trial about her use of the Yaris following the transfer, and Shah testified that she only used it once or twice a month. Plaintiff recalled Defendant's deposition testimony as being that it was her only vehicle and she drove it everyday. The Court has reviewed the deposition transcript and cannot locate any testimony to that effect. There is some testimony by Defendant that she still drove the Yaris after the sale, but there is nothing concrete as to the frequency of her use. Plaintiff has not demonstrated by the preponderance of the evidence that, given the existing lien on the Yaris and the transfer to satisfy that lien, Defendant's subsequent use, whatever the frequency, supports a finding that Defendant intended to hinder, delay, or defraud by transferring title of the Yaris.

Lastly, regarding the alleged inadequacy of the consideration, neither party introduced any evidence as to the value of the Yaris on the date of the transfer. At most, the ledger shows that Shah credited $5,700 towards Defendant's outstanding balance. That credit establishes

18

nothing about the adequacy, or inadequacy from Plaintiff's perspective, of the consideration. Shah testified he computed this credit after considering the Yaris' mileage and overall condition. Plaintiff offered no contrary evidence from which the Court could find by the preponderance of the evidence that the amount of the consideration received by Defendant was intended to hinder, delay, or defraud creditors. The Court therefore finds that Plaintiff's evidence regarding the transfer of the Yaris' title or the granting of a lien on the Dodge does not support any "badges of fraud" such that the Court can infer an intent on Defendant's part to hinder, delay, or defraud creditors.

### 4.     Transfer of 2000 Jeep

The final transfer is Defendant's transfer of a Jeep to her daughter in June of 2009. Plaintiff argues that the "badges of fraud" present in this transfer are the close relationship and the lack of any consideration. The Court first notes that Defendant disclosed this transfer on her Statement of Financial Affairs. At trial, Defendant testified she transferred the Jeep when her daughter graduated from college. Defendant transferred title to her daughter at that time pursuant to an agreement with Defendant's former spouse, who had purchased the Jeep for their daughter. Defendant further testified that Jeep was titled in Defendant's name solely for insurance purposes. Similar to the other purported "badges of fraud" discussed earlier, the Court finds that neither the relationship or the lack of consideration supports an inference of an intent to hinder, delay, or defraud. Defendant again convincingly explained the circumstances and reasons for the transfer so as to supercede any implication of a "badge of fraud." *In re Bernier*, 282 B.R. at 782.

In summary, as to Plaintiff's Section 727(a)(2)(A) objection, the Court reiterates that

exceptions to discharge are strictly construed against the creditor. With respect to the instances discussed above, the Court holds that Plaintiff has either not met his burden to show an intent to hinder, delay, or defraud by the preponderance of the evidence or Defendant has convincingly explained the circumstances surrounding the purported "badges of fraud" so as to negate any initial inference of an intent to hinder, delay, or defraud. The Court overrules Plaintiff's objection to Defendant's discharge on the basis of Section 727(a)(2)(A).

B.      11 U.S.C. § 727(a)(4)(A)

Section 727(a)(4)(A) bars a debtor's discharge if the debtor knowingly and fraudulently makes a false oath or account in connection with the case. "The false oath that is a sufficient ground for denying a discharge may consist of (1) a false statement or omission in the debtor's schedules or (2) a false statement by the debtor at an examination during the course of the proceedings." 6 COLLIER ON BANKRUPTCY ¶ 727.04[1][c], at 727-42 (Alan N. Resnick & Henry J. Sommer eds*., 16th ed. 2010)*. "As used in subparagraph (A) [of Section 727(a)(4)], a statement made under 'oath' includes a verification as to the veracity of the information contained in a debtor's petition, inclusive of the schedules and the statement of financial affairs." *In re Halishak*, 337 B.R. at 625 (citation omitted). For a plaintiff to prevail in a Section 727(a)(4)(A) action he must establish five elements: "(1) the debtor made a statement under oath; (2) the statement was false; (3) the debtor knew that the statement was false; (4) the debtor made the statement with the intent to deceive; and (5) the statement related materially to the bankruptcy case." *Buckeye Retirement Co., L.L.C., Ltd. v. Hake (In re Hake)*, 387 B.R. 490, 507

20

(Bankr. N.D. Ohio 2008) (quoting *In re Keeney*, 227 F.3d at 685).[3]

The purpose of Section 727(a)(4)(A) is to "ensure 'that those who seek the shelter of the bankruptcy code do not play fast and loose with their assets or with the reality of their affairs.'" *Posillico v. Bratcher (In re Bratcher)*, 289 B.R. 205, 218 (Bankr. M.D. Fla. 2003) (quoting *Boroff v. Tully (In re Tully)*, 818 F.2d 106, 110 (1st Cir.1987)).  Section 727(a)(4)(A) ensures that adequate information is available to the case trustee and creditors without the need for examination or investigation to determine whether the information is true.  *In re Craig*, 252 B.R. at 828-29.  Debtors have a "paramount duty to consider all questions posed on a statement or schedule carefully and see that the question is answered completely in all respects."  *Id*. at 829 (internal quotation marks omitted).  "Policy considerations mandate that the requirement to list all assets and liabilities is an absolute obligation of those seeking discharge of their debts."  *Heidkamp v. Whitehead (In re Whitehead)*, 278 B.R. 589, 594 (Bankr. M.D. Fla. 2002). "[A] debtor who fails to make a full and complete disclosure of relevant information places the right to the discharge in serious jeopardy."  *Id.*

"To be fraudulent, the oath must be made with a knowing intent to defraud creditors." *Syngenta Seeds, Inc. v. Wingate (In re Wingate)*, 377 B.R. 687, 704 (Bankr. M.D. Fla. 2006) (citation and internal quotation marks omitted).  "[T]he type of fraud contemplated under § 727(a)(4) is that of actual fraud, – as opposed to constructive fraud or fraud imposed by law – which looks to a defendant's subjective state of mind at the time of the transaction in question." *In re Halishak*, 337 B.R. at 627 (citation omitted).  "[A]ctions will generally speak louder than

---

[3]  While "a discharge may only be barred under § 727(a)(2) if the debtor's intent was to defraud a creditor or an officer of the estate, section 727(a)(4) does not so limit the objects of the debtor's fraudulent intent."  6 COLLIER ON BANKRUPTCY ¶ 727.04[1][a], at 727-40.

words, with admissions being rare and denials the norm.  Thus, the use of circumstantial

evidence, as opposed to direct evidence, is normally a must."  *Id*. (citation omitted).

> The requisite intent . . . may be discovered by inference from the facts.  A
> reckless disregard of both the serious nature of the information sought and the
> necessary attention to detail and accuracy in answering may rise to the level of
> fraudulent intent necessary to bar a discharge.  However a false statement
> resulting from ignorance or carelessness is not one that is knowing and
> fraudulent.

6 COLLIER ON BANKRUPTCY ¶ 727.04[1][a], at 727-40-41 (internal citation and quotation marks

omitted); *see also In re Kenney*, 227 F.3d at 685 (citation omitted) ("[A] debtor is entitled to

discharge if false information is the result of mistake or inadvertence.")

Once a plaintiff meets "the initial burden of putting forth evidence that all of the elements

of § 727(a)(4) have been met . . . the burden of production will shift to the debtor to provide a

credible explanation for their actions." *In re Halishak*, 337 B.R. at 626 (citation omitted).  "[A]

credible explanation is one that is both plausible and, despite all the indications of fraud, is still

capable of being believed.  This is not an insignificant burden." *Id*. at 629; *see also Colangelo v.

Eisen (In re Colangelo)*, 414 B.R. 136, 145 (E.D. Mich. 2009) ("[C]ourts have confirmed that . .

. an inability to provide a straightforward, innocent explanation constitutes evidence of

fraudulent intent.").  A bankruptcy court does not speculate as to a credible or innocent

explanation because "it is the debtor, and the debtor alone, who is in the best position to know of

and be able to explain the event(s) in question." *In re Halishak*, 337 B.R. at 626 (citation

omitted).

Plaintiff's Complaint alleged, under Count II, that Defendant's Schedules contained

multiple false statements.  Specifically, the failure to disclose: (1) Ownership of a 1999

Chevrolet; (2) the transfer of "the aforementioned vehicles" (presumably meaning the

22

Chevrolet); and (3) her correct home address. At Trial, however, Plaintiff abandoned these alleged false statements listed in his Complaint by not offering any evidence on those allegations. Following Trial, Plaintiff focused his post-trial brief solely on the allegedly false statement in Defendant's Statement of Financial Affairs regarding the transfer of the Yaris for $12,000, when the actual consideration was a $5,700 credit. The Court notes that its own independent review of Defendant's Schedules and Statement of Financial Affairs reveals that Defendant did not disclose the lien on the Dodge van granted to Shah on Schedule D.

With respect to the remaining alleged false statements, most of the elements under Section 727(a)(4)(A) do not require any discussion. Defendant's Schedules and Statement of Financial Affairs are statements made under oath. There is no dispute that Defendant transferred the 1999 Chevrolet. There also is no dispute that the lien on the Dodge van (which existed as of the date of petition) was neither scheduled or disclosed. In addition, these omissions or false statements are material to her bankruptcy case. *See In re Keeney*, 227 F.3d at 686 (defining materiality element broadly to include anything pertaining to the "discovery of assets . . . or the existence and disposition of [debtor's] property"). Thus, the Court holds that elements one, two, and five are met here.

The only elements disputed, as is typical in a Section 727(a)(4) action, are Defendant's knowledge and intent. *In re Halishak*, 337 B.R. at 627. To prove these elements, Plaintiff has the burden to show Defendant knew the Schedules or Statement of Financial Affairs were false or omitted something knowing such would create an erroneous impression. *Id*. (citing *In re Keeney*). In addition, Plaintiff can meet this burden if Defendant had a "reckless disregard" for whether her Schedules or Statement of Financial Affairs were true. *Id*. But, as noted earlier, if

23

Defendant's omissions are "'the result of mistake or inadvertence[,]'" *id.* (quoting *In re Keeney*), or if Defendant provides a credible explanation for the omissions, *id.* at 629, then she cannot be denied her discharge.

At trial, Plaintiff did not offer any testimony regarding Defendant's knowledge or intent as to the 1999 Chevrolet. The Court first notes that the evidence is clear that Defendant did not own the 1999 Chevrolet as of the petition date. Defendant testified without contradiction that she transferred the vehicle in March of 2008, some 17 months prior to filing her petition. The certificate of title for that vehicle also states a sale date of March 22, 2008. Thus, only the omission of that transfer from Defendant's Statement of Financial Affairs is at issue. The only evidence offered by Plaintiff pertaining to the transfer of that vehicle is Defendant's deposition testimony wherein Defendant stated she "sold" the vehicle sometime in 2008 to a Matthew Bair.

Defendant testified at trial that, like the circumstances outlined earlier with the respect to the transfer of the Jeep, she neither paid for the 1999 Chevrolet or considered the vehicle hers, but merely held title for insurance purposes pending another daughter's graduation as previously arranged with Defendant's former spouse. The only difference being that Defendant transferred the Chevrolet at her daughter's direction. In this regard Defendant's Trial testimony contradicted, to some extent, her deposition testimony that she "sold" the Chevrolet. In her post-trial brief, Defendant argues she failed to disclose the transfer "because the transfer occurred more than a year before she filed." However, question 10 on Defendant's Statement of Financial Affairs clearly requests the disclosure of all "property . . . transferred . . . with **two years** immediately preceding the commencement of this case." While in certain circumstances a debtor's omission of a pre-petition transfer because they thought the transfer did not count might

24

be grounds to infer a fraudulent intent, *see*, *e.g.*, *Flemings*, 433 B.R. at 240-41 (debtor's explanation that she did not think a transfer to her mother one week pre-petition "counted" found to lack credibility given the circumstances), for reasons similar to those discussed earlier with respect to the transfer of the Jeep, the Court finds Defendant's omission of the transfer of the Chevrolet at most to be inadvertent or the result of a mistake. It is true that "an omission alone . . . is grounds for denying a discharge[,]" *In re Cutler*, 291 B.R. at 725 (citation omitted), but the overall circumstances surrounding the transfer demonstrate that Defendant's omission was innocent or otherwise lacked any intent to hinder, delay, or defraud creditors. Nor do the circumstances permit an inference of knowing or reckless disregard for the truth.

With respect to the lien on the Dodge van granted to Shah, an omission not emphasized by Plaintiff, but noted by the Court, the van is listed on Defendant's Schedule C as exempt, but Shah is not listed on Schedule D as a creditor holding a secured claim. When asked at her deposition why she did not disclose the lien, Defendant testified, "I thought I did." Similar to the Chevrolet omission, the Court finds that Defendant's failure to schedule the lien was a mistake, "innocent or otherwise inadvertent." *In re Sharp*, 244 B.R. at 893. The overall circumstances simply do not suggest any intent to hinder, delay, or defraud creditors.

The final false statement is Defendant's disclosure on her Statement of Financial Affairs pertaining to the value of the Yaris transfer. Under question 10 of the Statement of Financial Affairs, Defendant disclosed a transfer to Shah for $5,200, but also a transfer of the Yaris for $12,000. Both disclosures are at odds with the undisputed testimony that Shah credited Defendant $5,700 towards the balance owed on his loan. While Defendant did not testify regarding the $5,200 figure, Defendant testified without contradiction that she "mixed up" the

25

Yaris transfer with an earlier sale of a Toyota Spyder for $12,000 "about two years ago" and that the $12,000 "had nothing to do with the Yaris."[4]  Moreover, Defendant credibly explained why she included the $12,000 figure – she mixed up a prior sale of the Spyder.  There is no contradictory evidence or testimony calling into doubt Defendant's claim of mistake.  Thus, the Court holds that Defendant's inclusion of the $12,000 on her Statement of Financial Affairs is inadvertent or is an innocent mistake not done with an intent to hinder or delay as argued by Plaintiff.

In summary, the Court finds no basis to deny Defendant a discharge under Section 727(a)(4)(A).

C<small>ONCLUSION</small>

The Court's concludes that Plaintiff has not met his burden so as to deny Debtor's discharge under 11 U.S.C. §§ 727(a)(2) or (a)(4).  Counsel for Defendant is directed to enter an Order consistent with this Opinion.

cc:     John Barcume
        Betty Fox

**Signed on March 29, 2011**

                                  **/s/ Daniel S. Opperman**
                                  **Daniel S. Opperman**
                                  **United States Bankruptcy Judge**

---

[4]  Because there is no evidence as to the exact date the transfer of this Spyder occurred, Defendant is given the benefit of the doubt that it occurred more than two years pre-petition and, therefore, the Court finds Defendant had no obligation to disclose that transfer. *Warren v. Rowland (In re Rowland)*, 441 B.R. 281, 287 (Bankr. S.D. Ohio 2010) (where debtor was unsure if transfer occurred "2 or three years" pre-petition, court held that while the "[d]ebtor's failure to ascertain the date of transfer before making a sworn statement might be characterized as a dumb mistake or carelessness, the limited facts now before the court do not conclusively establish fraud or recklessness with respect to this specific single act of nondisclosure").

26
